USCA1 Opinion

 

 August 19, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1079 ROYAL CARIBBEAN CORP. AND CARIBBEAN CRUISE LINE, LTD., Plaintiffs, Appellants, v. PUERTO RICO PORTS AUTHORITY, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Carmen C. Cerezo, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Lay,* Senior Circuit Judge, ____________________ and O'Scannlain,** Circuit Judge. _____________ ____________________ Francisco G. Bruno with whom Marisa Rivera Barrera and Sweeting __________________ _____________________ ________ Gonzalez Cestero & Bruno were on brief for appellants. ________________________ Jose Juan Torres-Escalera with whom Jiminez, Graffam & Lausell __________________________ ____________________________ was on brief for appellees. ____________________ ____________________ _____________________ * Of the Eighth Circuit, sitting by designation. ** Of the Ninth Circuit, sitting by designation. -1- BREYER, Chief Judge. This appeal raises the ____________ question whether the Puerto Rico Ports Authority enjoys Eleventh Amendment immunity from a tort action claiming that it negligently maintained Pier No. 6 in San Juan Harbor. We hold that the Authority, in operating and maintaining the San Juan docks, is not an "arm" of the Commonwealth government. Hence, it does not enjoy Eleventh Amendment immunity. We reverse a district court judgment to the contrary. I Background __________ On November 15, 1988, the M/S Sovereign of the Seas, a Norwegian passenger ship, was docking at Pier No. 6 in San Juan harbor. Suddenly, a steel post at the end of the pier broke, setting loose three mooring lines, which whipped across the ship, seriously injuring a crewman. Then, another line, attached to another steel post on the pier, snapped and struck a second crewman, seriously injuring him. Caribbean Cruise Line, the ship's owner, and Royal Caribbean Corporation, the ship's operator, compensated the crewmen. The crewmen assigned their legal rights and claims against the Puerto Rico Ports Authority to Royal Caribbean Corporation and Caribbean Cruise Line, which then brought this tort action against the Ports Authority. The Ports Authority claimed Eleventh Amendment immunity. The district court granted summary judgment in the Authority's favor. Royal Caribbean and Caribbean Cruise Line appeal. II The Standard ____________ The Eleventh Amendment bars a federal court suit against a state without its consent. U.S. Const. amend. XI. The question before us is whether the defendant in this case is "'an arm [or alter ego] of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.'" Ainsworth Aristocrat International Pty., Ltd. v. _____________________________________________ Tourism Co. of Puerto Rico, 818 F.2d 1034, 1036 (1st Cir. ___________________________ 1987) (quoting Mt. Healthy City School Dist. Bd. of Educ. v. __________________________________________ Doyle, 429 U.S. 274, 280 (1977)) [hereinafter Ainsworth]. _____ _________ We must answer this question in respect to the particular "type of activity" by the Ports Authority that is the object of the plaintiffs' claim, Puerto Rico Ports Authority v. M/V ___________________________ ___ Manhattan Prince, 897 F.2d 1, 10 (1st Cir. 1990), in this _________________ case the operation and upkeep of the piers and various other -3- 3 facilities in San Juan harbor. In doing so, we consider such matters as: local law and decisions defining the nature of the agency involved; whether payment of any judgment will come out of the state treasury; whether the agency is performing a governmental or proprietary function; the agency's degree of autonomy; the power of the agency to sue and be sued and enter into contracts; whether the agency's property is immune from state taxation and whether the state has insulated itself from responsibility for the agency's operations. M/V Manhattan Prince, 897 F.2d at 9 (1st Cir. 1990) (citing _____________________ Ainsworth, 818 F.2d at 1037); see also Lake Country Estates, _________ ________ _____________________ Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 400-02 ____ ______________________________ (1979); Durning v. Citibank, N.A., 950 F.2d 1419, 1423 (9th _______ ______________ Cir. 1991); Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, __________________ ______ 1044 (1st Cir. 1988). While not providing a mechanical "test" for entitlement to Eleventh Amendment immunity, these factors help us assess whether the Ports Authority has acted more like a private company, or more like the Commonwealth's government, in conducting the activities relevant to this simple tort suit. See M/V Manhattan Prince, 897 F.2d at 10 ___ _____________________ (immunity depends in part on "nature of [plaintiff's] claim"); Jacintoport v. Greater Baton Rouge Port Commission, ___________ ___________________________________ 762 F.2d 435, 442 (5th Cir. 1985) (indicating reasons for -4- 4 immunity are stronger where claim implicates "public policy" or "public affairs"), cert. denied, 474 U.S. 1057 (1986). ____________ -5- 5 III The Standard Applied ____________________ Several critical factors suggest that the Ports Authority, in running and maintaining the docks, is not ___ entitled to Eleventh Amendment immunity. First, Puerto Rico law gives the Authority the specific tasks of "own[ing], operat[ing], and manag[ing] . . . transportation facilities," P.R. Laws Ann. tit. 23, 336, including the "public property docks," id. 2202, where Royal Caribbean's ___ ship docked and the crewmen were injured. It authorizes the Authority to charge users of those docks fees "sufficient, at least, to . . . cover the expenses incurred . . . for the preservation, development, improvement, extension, repair, conservation and operation" of those docks, to "pay principal and interest on . . . the Authority's bonds," id. ___ 336(l)(1), and to "acquire, . . . produce, sell, . . . and otherwise dispose of . . . services, goods, and . . . property . . . in connection with its activities," id. ___ 336(i); see also id. 336(q),(s),(u), 2505. The Ports ________ ___ Authority does charge fees, which, its Executive Director says, "cover" its operating expenses. (Indeed, its annual financial statements show that its "net income" from fiscal years 1987 through 1989 averaged more than $5 million.) -6- 6 Taken together, these factors suggest dock-operating activities that are not "governmental" but "proprietary," rather like those of a private company that manages an office building and charges tenants for its services. Cf., ___ e.g., Ainsworth, 818 F.2d at 1038 (Puerto Rico Tourism ____ _________ Company's "activities as a purchaser and supplier of slot machines are not alien to a proprietary function"); Paul N. _______ Howard Co. v. Puerto Rico Aqueduct Sewer Authority, 744 F.2d __________ ____________________________________ 880, 886 (1st Cir. 1984) (government corporation "established to provide drinking water and sewage facilities . . . not normally immune"), cert. denied, 469 U.S. 1191 ____________ (1985); City of Long Beach v. American President Lines, ____________________ __________________________ Ltd., 223 F.2d 853, 856 (9th Cir. 1955) (proprietary ____ activity where government maintained harbor and charged fees to users). Second, the record indicates that the Ports Authority, not the Commonwealth treasury, would likely pay any eventual judgment in plaintiffs' favor (even if the judgment is for the full $531,812, plus interest, costs, fees and future payments to the injured crewmen, that plaintiffs seek). The Ports Authority says that its fees and other charges are "barely sufficient" to cover its expenses. But, those "expenses," the Ports Authority's -7- 7 Executive Director says in his affidavit, "include payment of judgments entered against it." And the Authority's public financial statements tell the same story, showing that the Authority deducted, from its annual revenues (before "net income") $1.2 million for "litigation claims and settlements" in 1988, and $76,000 in 1989. Moreover, the Ports Authority does not depend on Commonwealth financing for its income. Although the Authority points to nearly $2,000,000 in construction grants it received from the Commonwealth in the late 1960's, the record and the public financial statements show that the Authority, normally and in recent years, has not received substantial Commonwealth financing. To the contrary, it must pay the Commonwealth $400,000 per year in lieu of taxes. P.R. Laws Ann. tit. 23, 354. The same statute permits the Authority to reduce its annual payment of $400,000 if its "net income is not sufficient" in any fiscal year (a circumstance which, as far as the record and statutes reveal, would include shortfalls due to payments of court judgments). Id.; see also Canadian Transp. Co. v. ___ ________ _____________________ Puerto Rico Ports Authority, 333 F. Supp. 1295, 1297-98 _____________________________ (D.P.R. 1971). -8- 8 Further, the Ports Authority has insurance, which would insulate the Commonwealth treasury from the effects of an adverse judgment. Finally, Puerto Rico statutes provide that the Authority's debts are not "those of the Commonwealth." P.R. Laws Ann. tit. 23, 333(b). These facts weigh heavily against immunity. Compare Feeney v. Port Authority Trans-Hudson Corp., 873 _______ ______ ___________________________________ F.2d 628, 631 (2d Cir. 1989), aff'd 495 U.S. 299 (1990) _____ (where "liability will place the state treasury at risk," that is "the single most important factor" favoring immunity); In re San Juan Dupont Plaza Hotel Fire ________________________________________________ Litigation, 888 F.2d 940, 943-44 (1st Cir. 1989) (Puerto __________ Rico Tourism Company immune where Commonwealth supplied 70- 75% of Company's funds) [hereinafter San Juan Dupont]; _________________ Culebras Enterprises Corp. v. Rivera Rios, 813 F.2d 506, 517 __________________________ ___________ (1st Cir. 1987) (similar); Morris v. Washington Metropolitan ______ _______________________ Area Transit Authority, 781 F.2d 218, 225 (D.C. Cir 1986) _______________________ (immunity where "the practical result of a judgment . . . would be payment from [state] treasuries"), with Paul N. ____ _______ Howard Co., 744 F.2d at 886 (that Sewer Authority did "not __________ seriously dispute" plaintiff's claim that judgment could be paid out of Authority's funds supports finding of no -9- 9 immunity); Jacintoport, 762 F.2d at 441 (similar, concerning ___________ government port authority); Fitchik v. New Jersey Transit _______ ___________________ Rail Operations, Inc., 873 F.2d 655, 660-61 (3d Cir.) _______________________ (Transit Authority's dependence on state for only 30% of funds, and authorization to "purchase liability insurance" strongly supported no immunity), cert. denied, 493 U.S. 850 ____________ (1989); see also Durning, 950 F.2d at 1424 n.2 ("legal _________ _______ liability" of state treasury, not agency's "practical ability" to pay is "applicable standard"); but cf. San Juan _______ ________ Dupont, 888 F.2d at 943 (statutory provision that ______ Commonwealth not liable for Tourism Company's debts insufficient to outweigh other factors favoring immunity). Third, the Ports Authority operates with a considerable degree of autonomy. Its statute, which calls it a "public corporation," gives it a "legal existence and personality separate and apart form those of the Government." P.R. Laws Ann. tit. 23, 333(b). It has "complete control and supervision of any undertaking constructed or acquired by it, including the power to determine the character of and necessity for all its expenditures." Id. 336(d). It can sue and be sued and ___ makes its own contracts. Id. 336(e),(f). It may acquire, ___ use and dispose of property as it deems "necessary" or -10- 10 "convenient" in carrying out its lawful activities. Id. ___ 336(i),(j). It may "borrow money" and "issue bonds" as its activities require. Id. 336(n),(o). It has considerable ___ discretion in setting fees. Id. 336(l)(1). Its funds are ___ kept in accounts separate from the Commonwealth's treasury. Id. 338. The Ports Authority, not the Commonwealth, is ___ liable for payment of principal and interest on its bonds. Id. 336(u). And, as we have said, its "debts" and ___ "obligations . . . shall be deemed to be those of" the Ports Authority, and not to be those of the Commonwealth. Id. ___ 333(b). We recognize that other factors argue in favor of Eleventh Amendment immunity. The Authority's operating autonomy is tempered by the fact that several government officials and one citizen appointed by the Governor comprise its board of directors, that this board selects an Executive Director, id. 334, who communicates regularly with the ___ executive branch, and that this arrangement (according to the Executive Director's affidavit) permits the Governor's office to "exercise significant control over the planning and administration of its policies" (but not to "exercise control over the day-to-day internal operations" of the -11- 11 Authority). See also Port Authority Police Benevolent Ass'n ________ ______________________________________ v. Port Authority of New York and New Jersey, 819 F.2d 413, _________________________________________ 417 (3d Cir.) (Governors' roles in appointment of commissioners and veto over their actions indicates Authoritynot "independent"),cert. denied,484 U.S.953 (1987). ____________ In addition, the Authority must submit various reports to the Governor and the Legislature; it must follow other Treasury-prescribed accounting rules; it must keep its funds in Commonwealth-approved depositories. P.R. Laws Ann. tit. 23, 345, 338. Further, the Authority can (like a sovereign) exercise the power of eminent domain. Id. ___ 336(h); see also id. 339, 339a. And, it is immune from ________ ___ Commonwealth taxes (although it must, as we have noted, pay an annual $400,000 fee in lieu of taxes). Id. 348, 354. ___ Finally, as the district court found, relevant statutes and their legislative histories stress the "public" objectives of the Authority, including its mandates to promote "the general welfare," to "increase . . . commerce and prosperity," id. 348(a), and "to facilitat[e] and ___ motivat[e] the development of the economic sectors that drive the present Puerto Rican economy," Legislature of Puerto Rico, 1989 Act No. 65, at 300 (Aug. 17, 1989) (Statement of Motives for S. Bill 269, H. Bill 446). These -12- 12 express statutory and legislative purposes make the Authority's activities seem more "governmental" and less "proprietary." Nonetheless, these provisions are consistent with "proprietary" activities and findings of no immunity. See Durning, 950 F.2d at 1421 (Development Authority is not ___ _______ immune despite a statutory purpose to redress "critical shortage of adequate housing" and "to promote economic welfare"); Ainsworth, 818 F.2d at 1038 (Puerto Rico Tourism _________ Company not necessarily immune despite a statute declaring it an "instrumentality of the Government" with the purpose of "promot[ing] tourism and overs[eeing] gambling"); Riefkohl v. Alvarado, 749 F. Supp. 374, 375 (D.P.R. 1990) ________ ________ (Puerto Rico Electric Power Authority not immune, despite statute declaring it a "governmental instrumentality" with the purpose of "promot[ing] the general welfare and increas[ing] commerce and prosperity"). After all, a private entity might operate a hotel or restaurant, in part with the object of helping to promote economic prosperity and development. Overall, the factors militating against immunity predominate. They indicate that the Ports Authority is an entity that enjoys a considerable degree of autonomy, that -13- 13 provides a service (maintaining and operating docking facilities) that it, in effect, "sells" to users, and that it here faces a lawsuit in which the plaintiffs seek a judgment likely to be paid from the Authority's funds, not from the Commonwealth's Treasury. Numerous cases find no immunity on facts very similar to those present here. See, ___ e.g., Feeney, 873 F.2d 628; Jacintoport, 762 F.2d 435; City ____ ______ ___________ ____ of Long Beach, 223 F.2d 853; see also Paul N. Howard Co., ______________ ________ __________________ 744 F.2d 880; Durning, 950 F.2d 1419. _______ We recognize that, in M/V Manhattan Prince, we _____________________ found that this same Ports Authority enjoyed immunity from a tort suit claiming negligence by a Ports Authority-licensed harbor pilot. In that case, however, the Ports Authority's relevant "type of activity," 897 F.2d at 10, was fundamentally different. The Authority did not "sell" pilot services. It did not "train pilots" or "derive[] . . . revenue from the . . . pilot system." Id. at 12. Rather, ___ the shipowners, required to use the pilot service, paid "a fee directly to the pilot and also into a trust fund, created by [the Ports Authority], for the pilots' pension." Id. at 10 (quoting district court opinion, 669 F. Supp. 34, ___ 37 (D.P.R. 1987)). The Authority lacked the "power to control the actions of the pilot while he" performed his -14- 14 duties. Id. The Authority's role was not that of selling ___ _______ pilot services, but, rather, was that of regulating the __________ licensing of pilots (and regulating pilot fees and retirement benefits). Such regulation is traditionally a governmental, not a proprietary, function. Id. at 10-11. ___ The difference between the primarily "governmental function" at issue in M/V Manhattan Prince, and the basically _______________________ "proprietary function" here at issue explains the difference in result. For these reasons, the summary judgment in the Port Authority's favor is Reversed. ________ -15- 15